Judge Reinhart, and may it please the court, I'm John Thorne for Verizon, and my opponent's name is Covad. I think there may be a misprint. Covad. Covad. Yeah, it is a misprint. All right. I'm going to try to reserve a couple of minutes of time to respond to Covad's cross-appeal. But we're here because the district court precluded Verizon from pursuing its ordinary common law remedies for a massive fraud, a scheme that involved literally over 20,000 misrepresentations that we were able to verify that was told to us by over three dozen of Covad's own former employees and that diverted Verizon's workers and our telephone lines from serving other honest customers. The district court erred when it relied on the filed tariff doctrine to preclude the normal availability of the common law tort system, including precluding the enforcement of the tariff itself, which was something we had asked for. I've got to start with whose interest is being protected by filed tariffs? And I have to confess, it's not the carrier's interest. It's the interest of other customers, because when one customer is able to get for itself a preference in service quality or a rebate in price, that's a disadvantage of discrimination against the other customers. The other interest being protected is the interest of the regulators in ensuring that the carrier is offering the statutorily required service on the proper terms and price. Those two interests, the interest of the other customers and the interest of the regulators, do not immunize everything in the relationship between a carrier and a customer. The Supreme Court's most recent filed tariff decision, the AT&T central office telephone decision, at the end and in the beginning and the middle is very careful not to say that everything about the relationship is governed by tariff. In fact, at the end of the decision, it points out that the Communications Act has a savings clause in it that, quote, preserves rights not inconsistent with the statutory filed tariff requirements. And the Chief Justice concurs specially, agrees with the decision, but concurs just to emphasize, I quote again, the tariff does not govern the entirety of the relationship between the common carrier and its customers. So the question is, what part of this carrier-customer relationship is governed by filed tariffs? And there are two ways to look at that. One is you can look at the statute and see what does the statute require to be tariffed. That's what the Evans court, this court in Evans said, the filed tariff doctrine derives from the statute. Neither COVAD nor the district court points to anything in the statute that required the tariffs to regulate COVAD or any other customer's behavior. The other way you can look at this is go right to the purposes of the doctrine, and that's what I propose to do for a few minutes. Before you do that, can I just clarify one thing? In the interconnection agreements that are filed with each state agency, does the state agency actually approve the rights that are in there? Yes. Yes, Judge Pais, they approve the entire interconnection agreement as though it were a tariff. Verizon's position, like COVAD's, is that the interconnection agreements count as tariffs. And under the Telecommunications Act of what was it, 1995? 1996. 1996. Those agreements are required to be filed with all the state utility? Required to be filed and also required to be approved. It's actually a little bit better than mere filing. They're actually approved by the state commissions. You couldn't sue in court for breach of the tariff, violation of the tariff in a simple damage action? To the contrary, Judge Reinhart, we routinely sue because the state commissions don't enforce the tariffs. The state commissions don't hear fraud cases. They don't even hear simple collection cases. If a customer doesn't pay us under the tariff, we sue in court to collect under the tariff. Or if we overcharge a customer, for example, in the Southern District case that we cite, the Buy This case, where MCI was overcharging its customer, the customer can sue MCI, notwithstanding the filed tariff doctrine, on the overcharge to enforce the tariff. But you're limited to enforcing the tariff, correct? Well, with the cases you just, in the circumstances you just elaborated on, the action is to enforce the tariff. Those cases, Buy This, and the other case we cite I think is Indiana, Bellingham's Ward, involved enforcing the tariff. And here, too, our initial complaint, our First Amendment complaint, sought, seek to enforce the tariff. We asked for an injunction to require COVAD to limit its trouble reports to real troubles and to do real testing like the tariff requires them to do. We asked for an injunction to require that, and the district court didn't let us even enforce that aspect of the tariff. Did you ask for debt relief? Did you ask for debt relief? We asked for all other proper relief, but we asked specifically for an injunction. If you look at paragraph, I think it's two of our complaints. No, that's right. You asked for an injunction, but not specifically for declaratory relief. COVAD, at the time we asked for it, and my understanding is still, was submitting massive numbers of false trouble reports, causing our people in trucks to go look for things that don't exist. Now, why didn't you file an alternative claim for relief under the contract? Judge Nunez, we thought at the beginning, and the district court as well thought up until right before he seemed to have changed his mind in the summary judgment proceeding, thought that the contract did not cover the kind of behavior that COVAD was committing. The oddest thing is that not only, it wasn't just Verizon thinking this way. But now you're saying very clearly it does. Suddenly it's clear to you. Well, now, Judge Nunez, my position is it's that what COVAD has done is not covered by the filed agreements. It is not because. But you want a chance to plead it. If the court decides that the district court is correct, that we're entitled to the limited misdirect fees or that we're, as we asked, we're entitled to an injunction to prohibit COVAD submitting things in contravention of the tariff, then we do want an opportunity to amend. If you're allowed to sue beyond the filed tariff for the harm done in your business by COVAD's misrepresentations, is that amount very much? The harm we estimate is in the millions of dollars. Let me give you two examples of very, very concrete harm. This is also, I've got to say, harm to other customers. Two different types of harm I think we're talking about. One is sort of like the slander or the misrepresentation, the damage to reputation. And the second kind of harm is the cost to you by their failure to perform their obligations properly. There is that, but there are two others. And I'm not sure these were clear from the paper. So I'd like to actually make sure the Court understands these two very concrete harms. They're in a complaint. And I think the district court's decisions reflect them. But I want to make sure this Court understands them as well. One is COVAD achieved for itself a price rebate on the service we offered. Because if you submit enough trouble reports, there is a rebate mechanism that the states enforce off the price of the total service. So I don't know what the total billings to COVAD were in a year. Say it was $20 million. We do know that we paid COVAD a rebate of about $2 million. Other customers of ours that only submitted real trouble reports when they occurred and did the testing to isolate where the trouble occurred did not get these rebates. COVAD got a preference that other customers didn't in the form of rebates. That's one form of harm. We paid them rebates. The other is one of the motivations we understand from COVAD's employees for submitting these was they didn't like the standard of quality that they were entitled to under the agreements. It's a little bit technical. I apologize for that piece of it. The agreements say that a loop comes – there's a mix of quality in the network. The lines were laid over time. They were laid for voice, not data. Some are long. Some are short. Some have splices in the middle that make the quality of various amounts. The agreement says you get a 30 decibel or better noise on the loop. COVAD would test the loops that we delivered, in some instances, and see that they were within the 30. That was the grade of loop that they were entitled to. But they wanted 20 or better because they were putting electronics on either end that added noise, and so they wanted a quieter loop than the agreement provided. So they would submit trouble reports repeatedly until Verizon eventually said, to avoid the trouble reports, we'll change the loop. Two of their former employees told us that this was a practice of COVAD. They didn't like 30-decibel loops. They wanted 20-decibel loops. They got 20-decibel loops from Verizon, a preference that other customers that followed the procedures did not get. In fact, a preference that Verizon, when it provides its own customers DSL service, Verizon gives them 30-decibel loops. That's what the agreements call for, and we're required to provide our own customers only a parity service, not a superior service. In the Supreme Court's AT&T central office telephone case, there's kind of a neat old case involving racehorses and trains cited at the end as an example of an illegal preference. Apparently the train had fast trains and slow trains. There was a side contract where the shipper of the racehorses wanted only the fast trains, and the court in the earlier case said you can't enforce a contract that gives one customer a preference for fast trains. COVAD could not have gotten fast loops from Verizon by contract. They should not be allowed to get fast loops by tricking us, by fraud. I interrupted your answer to Judge Newman's question because I wanted to understand what type of damages you were talking about when you responded. So do you want to get a focus on that? The harm done to your business relations, how much did you lose? I think it is in the small number of millions of dollars. On a base of probably billings to COVAD in the tens of millions of service provider. They caused our people tens of thousands of times to get into trucks, to look for trouble that wasn't there. No, no, no. What it did to your reputation. I'm sorry. No, I'm focusing on one single thing. You made the statement that it hurt your business reputation. Did you lose some business? We believe we did lose business. How much? I don't know how much. Well, a million? Ten million? Probably in the millions. I'm not sure how many millions. That's a very vague thought. No, it's a You must have made some estimate. We have not made an estimate of the reputational damage. I mean, you just threw it out there. Both COVAD and Verizon sell their DSL service through intermediaries, internet service providers. COVAD could go to the internet service providers and say, we are getting better loops than you can get from Verizon. Well, they could, but we know nothing about it. You haven't made any progress. The only discovery we have had in the case has been from our own investigation, talking with former COVAD employees. We've had no discovery in the case. The case was essentially stopped at the police station. What did they tell you? They told us that they were directed to falsify trouble reports. No, but what did they tell you about getting business that you should have gotten? We don't have evidence on that, Your Honor. The other purpose that would be served by immunizing COVAD's conduct under the file tariff doctrine is preserving the field that the regulators need to occupy under the statute. As I said, there's nothing in the statute that requires the regulator to police the customer's conduct. And, in fact, given the nature of things that could occur, it would be impossible for the regulators to deal with the customer's behavior. I mean, if you looked at one of these interconnection agreements, it's almost enough to specify what the carrier has to do, what the specific service terms are and the prices, to try to specify all the things that the customer shouldn't do is nearly impossible. The regulators don't do that. The statute doesn't require them to. Don't these agreements come up for renegotiation periodically? They do. And the one that we're dealing with here, has it been up for renegotiation? The agreement here, I don't know, Judge Pius, whether this has been up or not. I know that it's a standard provision in this agreement and in others that before COVID submits a trouble report, there has to be a real trouble. That's clear. And they have to do a test to isolate where the trouble is. Because if they will isolate where the trouble is, we spend less time looking for it before concluding that there's no trouble. You have the right under the 96 Act to go to the State Utility Commissions to ask for any relief of any kind? I guess I don't want to foreclose my imagination from working better later, but the State regulators do not sit to hear cases like the one that we filed in San Jose. Typical enforcement of the agreements or anything outside the agreements, I still want to convince you this is outside the agreement, is not heard by the State. So they only get involved when it's time for approval of the new agreement or the negotiated agreement? Or if there are concerns about the carrier service, because their focus is that the carrier, the utility, provide good terms and price for service. Those are the questions. Well, they can step in, can't they, if there is a dispute between the two entities in negotiating their interconnection agreement and arbitrate any dispute, isn't that right? That's correct. They can. They can, but that's on the making of the agreement. Right. I don't see how this agreement would need to be made any clearer. COVAD has accepted responsibility for troubleshooting and to submit only real troubles, not false ones. Now, to follow up on Judge Price, when did you make the agreement with COVAD? I would have to check, but I think it was we actually have several different agreements in 13 States. I think they began in 1998. And when did you discover the trouble? The former employees told us that COVAD began opening hundreds of false trouble tickets in October of 1999 through approximately March of 2000. In March of 2000, COVAD's business was deteriorating so fast that it began opening intentionally false trouble tickets in large, large volumes, and it was sometime after that that we understood from the roadmap that the former employees gave us that this was not just a... Well, something must have come to you when the volume of trouble tickets shot up. You would think so. If COVAD were our only customer, the volume of trouble tickets should have been a clue. In fact, we have a lot of customers who are decentralized in 13 States. As of today, we've provided about 7 million loops to various customers. It really was when the former employees told us they'd been directed to make this up in volume that it crystallized. It was clear. Now, have you renegotiated the agreement with COVAD? I think the answer is no, but I would have to check. Are you able to renegotiate? The agreement expires, and we could renegotiate it. But, again, I'm not sure what more we would do. Well, it's pretty clear what you could do. Specification, I have to say, these have to be made in good faith. The agreement today, this is the Massachusetts one, Excerpts of Record 278, says there has to be a customer trouble and that COVAD accepts responsibility for initial trouble isolation. There are tests it does. The reason it does the test is because Verizon's piece of this total circuit is relatively small. And it goes on to say if it's erroneous, you get a higher price. If there is a trouble and if they've tested, there's a fixed price. If there's not a trouble and they haven't tested and they're just sending these things in waves to get rebates and to get better loops, then there is not a fixed charge. Well, I'm sure you could write something in that's provided for that. When we were before the district court, Judge Noonan. What's that? Well, Judge Noonan, when we were before the district court, we started talking about all the different things that a customer could do. It's possible a customer could leak battery acid in our central office. I suppose theoretically we could agree to a price for that. Judge Fogle said, what if COVAD set off a bomb in your central office? There are lots of different torts that customers could commit that could be in agreements, but that's not the standard for the file tariff doctrine, the standard under the court system. Well, that's the question. I think a bomb would be on the file tariff. Well, Judge Fogle thought so, too. But then why not intentional submission of tens of thousands of reports that give a preference in the quality of line and rebates off the price of the line compared to other customers? My understanding, the file tariff doctrine has two ways of controlling. One is if the conduct is in the tariff, and the other is if the statute requires it to be, not just could it be, but is it required to be. The Supreme Court's case says the entire relationship is not in the tariff, only those things that are required to be. And there's nothing in the statute that says the customer's behavior needs to be regulated. Well, if the end result of this litigation is to affect the tariffs, the rates that they pay, then why isn't that sort of covered by the file tariff? The end result of the litigation should be that COVAD and Verizon operate under the tariff, and COVAD does not commit torts that are outside the scope of the tariff. You're seeking compensation, though. Compensation and an injunction, either to require them to do the testing and submit only real troubles and to compensate us for the false, untested troubles that they did submit. Doesn't that ultimately affect the rates that are in the interconnection agreement? The only effect on rates that I see, Judge Pius, is that there will not be rebates based on false troubles, and therefore COVAD will pay the same as other customers under the tariff. This will bring them into equity with the other customers, and it will eliminate a preference that they've achieved through their fraud. If it's all right, I'd like to save the rest of my time for responding to their cross-appeal. Good morning, Your Honors, and may it please the Court. In this case, Verizon asked a jury to decide, based on common law principles of fraud, negligent misrepresentation, and California's unfair competition law, how much COVAD should be forced to pay when Verizon rolls out a truck to determine to fix alleged trouble on a telephone line. In trying to explain how that doesn't lead to the conclusion that they're asking a jury to determine a rate instead of using the filed rate or filed tariff, as the law requires, Verizon's most recent written statement comes in a 28J letter that their theory. In this case, Verizon seeks to enforce the terms of filed tariffs that require COVAD to test to determine whether there was a trouble on a telephone line and to isolate the location of the trouble before submitting a complaint. COVAD's issuing more than 23,000 knowingly false reports asserting the existence of trouble that did not exist violates its tariff requirements, peren, making the case unassailable, close peren, and constituted fraud. That argument doesn't make sense, with all due respect. It isn't how the filed rate doctrine works, and it's not close to how the case law works. And I might add, I'm not going to spend my time talking about the facts of this case, but Mr. Thorne began by attacking my client and assuming that all of these statements about what my client has done is correct, that there are 23,000 frauds out there. We very strongly believe that that is nonsense, that it is completely a contrived claim made up for other purposes, which I'll try to address in the slap suit. But I didn't want to leave that unstated. To answer some of the questions, what the Telecom Act of 96 requires is that there be a detailed schedule of itemized charges for everything that the carrier is providing. That's in 47 U.S.C. 252A1. That has to be approved by State regulators. That's in 252E1. It has to be filed with them. That's in 252EH. And it has to be offered to everyone else. And Verizon has to be approved. Roberts. Those are negotiated, though, correct? They are negotiated deals that then the regulators need to approve after they are negotiated, correct? Can they alter the deal? The regulators can say, no, you can't do it this way, and insist that the deal be done differently. And they can also insist that everybody be treated equally. That's why they're filed, so that you can cut and paste. Can they fix the rates? They can say this is an unreasonable rate. They can tell you it's wrong. Can they say you have to pay this rate? I believe they can. There's an arbitration procedure, so the result of the arbitration is that you have to pay this rate or that rate. And to follow up on some other questions that were asked, the now, I believe, uniform case law, well, the uniform case law is that public utility commissions have the authority to interpret the interconnection agreements. Right. And where the debate in the case law currently is, is whether you can go directly to a Federal court without first going to the public utility commissions. And actually, some of Verizon's lawyers, when representing Bell South, are arguing you can't go straight to Federal court to bring this type of claim. For 100 years, the filed rate doctrine has basically focused on the impact of the relief involved in the case. In every crystal clear statement that's been made in the last few years, what they've said is anything that affects the relief is barred by the filed rate doctrine. In Arkansas, Louisiana, Guess, the Supreme Court wrote it would undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with the commission and thus never found to be reasonable within the meaning of the act. And in Brown, this Court said, A corollary to the rule that no one may bring a judicial challenge to the validity of a filed tariff is that no one can bring a judicial proceeding to enforce any rate other than the rate established by the filed tariff. Now, what Verizon wants to do is say our tariff does have a charge. If we go out and we don't find trouble, it's calculated down to the penny. And while it varies from particular interconnection agreement to interconnection agreement, there are very specific numbers. A common number is, say, $99.61. Now, Verizon calls this nominal. Incidentally, DSL services, you may know, at the time sold for about $49.95 a month to a residential customer. It's even less frequently now. You're talking if COVID sent this false trouble ticket of giving up two months' revenue, not two months' profit, two months' revenue on the line if Verizon ever charged them. And another background fact, Verizon never charged for these 23,000 supposed false claims. They never claimed they were false until they came in an alleged fraud. Now, under the case law, you cannot go to a jury and say, all right, we did do this truck roll, but we want you to charge a different rate for this truck roll. We want you to use common law fraud and give us all these other costs that we incurred, lost reputation, collateral damage. It costs us more to do it this way. There is nothing in the filed rate doctrine that permits it. In fact, what the case law is far more extreme than what's involved here. Central Office Telephone, which Mr. Thorne cites, is a case where this court was reversed by the Supreme Court. It involved not tariff services, but services that were outside the tariff. AT&T said, okay, look, if you sign up for four years, we'll do this for you and that for you. And this court said, okay, the file rate covers the rates you do have, but not these, and the Supreme Court says it doesn't matter even if the services aren't under the tariff at all, because it affects the mix of tariffs. And as this Court said in citing it in Brown, it taught it – in citing AT&T in the Brown case, it covers all things that pertain to subjects that are specifically addressed in the filed tariff. Now, the idea that Verizon going out to check trouble tickets is not addressed in this is something Verizon says just the opposite. In fact, this case is worse for several reasons. First of all, not only does this case arise under the tariff, this case, unlike most of the other cases, absolutely depends on the tariff. Why? Because in the real world, there isn't an obligation for people, before they call the telephone company, to do troubleshooting for them. I don't – you know, if my phone's unplugged and I call them and I say it doesn't work, they can come out. I may have to pay them for the trip, but I don't have any obligation to tell them I've done troubleshooting. Their only argument for why there is supposedly a fraud is that by contract, COVAD agreed to do troubleshooting. So it's under the tariff in the first place. And their theory for why they can't proceed under the tariff is, well, yes, you violated this, but you intentionally violated it, and our theory is you can't bring a claim for violation of our agreement or the tariff when the defendant acted intentionally. There is nothing in the tariff that says that that's true. There's nothing that said that that's the way you do it. And Verizon brings numerous claims under this tariff, regardless of the mens rea of the parties. But now you're objecting to their filing again and amending the complaint and suing you under the tariff. All right. Let me address that, Your Honor. I understand that they have to reopen the judgment. You say it's summary judgment, but why was it – I mean, it was essentially a judgment on the pleading, wasn't it? Well, not precisely. I think there are two problems. First of all, even if it were, Weeks was a judgment on the pleadings also. This Court's decision in Weeks involved a judgment on the pleadings. But you know there are differences. That was a kind of nuisance case. This is not a nuisance case. This is not a nuisance. It's an enormous pain in the neck for us, Your Honor. But it's not a nuisance case. But if they're out on it, we don't know what's true or false. We have to take their – what they claim to be true. And if it's true, your client is a scoundrel. Well, Your Honor, let me address why they shouldn't be able to amend the complaint. All right. First of all, I don't believe it's the law of the circuit that you create a special class of stuff. Secondly, factually, that's not this case for several reasons. First of all, it's not true that Verizon conducted no discovery. The parties are both citing depositions to you. Verizon and COVAD have been in antitrust litigation since 1999. They deposed a bunch of these declarants in the context of the antitrust litigation so they could use it in our case. And it was a summary judgment motion. They filed a Rule 56-F affidavit. They filed affidavits in response to it. The Rule 56-F affidavit at that point, not on the slap motion, but at that point was considered. Well, let's put it this way. Let's say they made a mistake in not pleading this to begin with. Why should we bind them because they made a strategic error? Your Honor, because it is not an abusive discretion for the trial court below not to buy that this was a simple mistake. Your Honor, from day one in this case, Verizon knew we could assert a contract claim. Its complaints talked about having a, you know, having these interconnection agreements. Its whole theory was you violated a provision of the interconnection agreement. When we moved for dismissal, Judge Fogel told them that there was a serious question, in his opinion, on March 22nd, that the case was going to be thrown out on the filed-rate doctrine and invited us to file a summary judgment motion. Then we moved for summary judgment. They still didn't amend their complaint. They didn't argue in response to that motion at any instant that, oh, well, of course there would be a contract claim. To the contrary, they filed a motion to dismiss our counterclaim on the theory that parties need to raise all claims at once right at the beginning of the case. Then after Judge Fogel ruled, this came up in a bizarre way, they filed a motion to, quote, clarify. And what was the motion? Well, Judge Fogel, yes, you've rejected every claim we've presented before us, but clarify your order to carve out what we're now free to bring. That was a mistake. It was a motion to alter or amend under 59e that you and your order should clarify it to say we can bring this claim on other theories that we haven't chosen. And in support of that 59e motion, they didn't make any argument why they couldn't have brought it sooner. So when we opposed it, we said, well, what's the reason you couldn't bring it sooner? And the interesting thing is in reply on that motion, they didn't make the argument they're making now. They didn't argue, gosh, we had no idea that an intentional violation of these interconnection agreements is a violation. What was their argument? They put in an affidavit from a Verizon lawyer, Mr. Zastrow. It's docket number 154. And Mr. Zastrow said, here's why we couldn't do it. Because if we were going to bring a contract claim, we'd have to look at the interconnection agreements and figure out how much they charged in each of these States. And that would have taken us a lot of time. It's no joke. That was what he did. And we said, that's ridiculous. I mean, you can bring the claim, you can assert it. Mr. Thorne can't tell you his damages on the fraud claim. That's much more complicated. And in any event, point of fact, the amounts on the interconnection agreements were an attachment to our motion for summary judgment. So they already had it. And we said, that's nonsense, Your Honor. That's not a valid reason. Now they come up on appeal, and Mr. Thorne is telling you that it is an abuse of discretion for Judge Fogel not to have to have allowed, not to have, you know, allowed them to test out their tort claims first and bring their contract claim, because he should have appreciated the argument he's now making on appeal as to the reason why they did it, because they didn't make that argument below. Now, the point for this Court is, does Judge Fogel have the right to say no? You can't look at this, insist on doing it. There are all kinds of reasons why they wanted to bring this as a tort claim. For one thing, they wanted to use this to send it to regulators and saying you did 23,000 contract violations is not nearly as interesting. For another thing, if you're opposing a filed-rate doctrine argument tactically, you do a lot better not appending a contract claim to it, because it kind of concedes that it's all under the filed rate and it undermines your argument. They could have brought this claim from day one. They waited until the end of this entire proceeding, after they had gotten summary judgment, and said, well, let's start this all over again. We've got a new theory. Now, no court has ever held that that's an abuse of discretion. And in the 389. Gershengorn How long was the case pending? From the time it was filed until the time Judge Fogel granted summary judgment? It was filed in June of 2001, and Judge Fogel denied the motions for reconsideration, I believe it was January 2002, so we're talking 18 months. Your Honor, if I could now move on to the slap argument for a bit. Your Honor, whether you look at this case formalistically, and I noticed in rereading the briefs how formalistic all the arguments, we're all saying this is this and this box, or the purposes of the slap statute. There are. I doubt that when they passed the slap statute they had this type of case in mind. Your Honor, when they passed the slap statute, they consciously wrote a very broad statute, and they consciously wrote it broadly because they wanted to deal with all the range of protected activity. That's what the language of the statute reads. And in the case of COVAD, in case of this complaint, understand what it did. The complaint didn't just incidentally mention First Amendment activity. It said as part of its nature of the case that COVAD exercised pressure by going to the mediator and regulators and, in fact, talked about going to Congress. That performance assistance plan, what Mr. Thorne is referring to as the, quote, Mr. Thorne's theory for that is that COVAD went to regulators, presented them with these supposedly false trouble tickets, and got the regulators to say, oh, Verizon, you're not doing as well as you should on performance metrics. So COVAD made representations to regulators that it's now being sued about and that Mr. Thorne still claims are elements of damages in this very case, even now, even after they amended the complaint. There is nothing in that complaint that said when we said you did fraud against the regulators, we didn't mean to say that that was part of the fraudulent activity under our UCL claim. No, as a matter of fact, they specifically incorporated it. There is nothing in the complaint that said when we seek injunctive relief, we want an injunction saying that you shouldn't lie to regulators because we've said it's wrong. There is no limitation on that either. All of their claims incorporated all of the allegations. Now, what Judge Fogle did, which was, I think, entirely just mistaken, is he said, okay, I'm going to allow you to give a we don't mean it defense. Yes, we have all these allegations. Yes, they're incorporated, but we really didn't mean to attack you. We'll reformulate our claim in a way that it doesn't deal with this conduct. Now, the California courts are explicit that you can't do that. They were explicit at the time in the various cases that say you can't amend to We have different standards under the Federal Rules of Civil Procedure for leave to amend. Yes, we do have a difference. And we follow our procedures. We follow under Metabolite. We follow the Federal procedure. But the question is not can you file a leave rule to amend. The question is what's the effect of that. If I file a complaint in violation of Rule 11, can I avoid Rule 11 sanctions by saying, oh, you filed a motion, quick, I'll amend the complaint? Well, there's a safe harbor under Rule 11, yes. You can avoid it. You can avoid Rule 11. You can avoid Rule 11 sanctions now very easily. Well, you can. I'm sorry. It's a bad example. But if I file a complaint in violation, if I reveal trade secrets in the complaint, if I file the complaint in violation of other court orders that have enjoined me from filing complaints, if I do any violation by doing it. That's an entirely different circumstance. If the Federal system, if you interpret Metabolite. There was no injunction here barring the allegation, barring Verizon from making the allegations here. There wasn't, Your Honor. But the question is not can you amend a complaint. Judge Fogle had ample discretion to decide not, you know, to give them leave to amend before you have to rule on your slap. There's nothing in our rules that says that the district court judge has to rule at that moment on your slap motion. Well, what Metabolite says is unless the Federal rules and the State rules are in direct conflict, you apply the slap rules to them. It is absolutely clear under California procedure you couldn't do this because it defeats the purpose of it. And it's clear in the Lockheed case that the point of this is to avoid forum shopping. If you tell every plaintiff you can bring a free slap suit, as long as you amend the complaint subsequently, you're essentially vitiating both Lockheed and Metabolite, the portion of Metabolite that follows it. And Metabolite set forth a procedure they could follow. They can follow Rule 56F, but they didn't do that. They didn't say they needed discovery to respond. They didn't provide any answer to that. I don't know the answer to this, but could they have filed this case right in Superior Court? Excuse me? Could they have filed in State court? Could they have filed in State court? Well, originally they had a Lanham Act claim. I don't think Federal jurisdiction is exclusive under it. Certainly after they took the Lanham Act claim, it's a diversity case, so they certainly could have filed this case in State court. And that's what Lockheed is focusing on, because Lockheed was a Federal question False Claims Act case that involved pendant State claims as to which it applied the False Claims Act. I'd like to – I don't – you know, there are a number of other issues that I'm not sure, you know, I'm not sure whether the Court is interested in hearing argument on the 90-day policy. I have one other question. I want to go back to the interconnection agreements and the filing with the State agency. You said that – let me ask you this. Your interconnection agreement that's filed, let's say, with Massachusetts Utility Commission, if a new competitive outfit were to come into the market in Massachusetts, would Verizon have to offer them the same rates that they've offered to you? Verizon would have to make it available to them if they want to, and otherwise they could negotiate an interconnection agreement, and there's a desirability of uniformity, and it would be reviewed by the PUC. Sometimes people's situations, you know, you're comparing apples and oranges. But anybody else can pick the provisions. That's why they're set forth. That's how the statute is structured. Your Honor, I – These rates really aren't classic old-time tariff rates. Well, I mean, they were negotiated first, but they're classic old-time. This isn't just – you know, this isn't one of the cases where they file the tariff and they don't look at it, which is a lot of these cases, you know. And going back to one point that Mr. Thorne made in opening, he talks about the purposes of the filed rate doctrine. He talks about, you know, non-discrimination. Their theory of non-discrimination is if we go after – if we pick one of the people to go after and we ask them to pay much more than just our service rollouts, we ask them to pay our consequential damages and everything else, that's not discrimination. The discrimination is somehow only a preference. There's no way that that's the case law. And to say that it respects regulatory judgment to have a jury determine in the first instance what the rates ought to be, that's not correct either. What's your response to the argument that they've sought injunctive relief and that the filed rate doctrine doesn't bar a court from enjoining violations? Your Honor, there are a couple of responses. First of all, understand how this played out below. There is this paragraph in the complaint, but it was barely mentioned in response to our motion. There's a passing reference to it. When Verizon argues it here, it first of all overstates the case law. If you look at the cases it cites for that proposition for a general injunctive relief exception to the filed rate doctrine, it cites ICC v. Transcom, which doesn't hold that at all. It holds that a regulation can trump the filed rate under certain circumstances. It cites Marcus primarily. And in Marcus, what the court said in dicta was Marcus was a case in which they sued saying that you should have told us that you were rounding minutes up. You know, it's a minute and one second, but you're rounding it up to two, AT&T. And the court said in dicta, it said, well, you know, I suppose it might be conceivable to have an injunctive issue. First you have to look at whether the injunction will affect the rate. It isn't an automatic carve-out.  But we don't have to reach that because they're automatically on notice what the tariff says, and they can't claim reliance to have relied on anything different than the tariff, so we don't have to reach that issue. Whether Marcus is actually correct is unclear because later that year the Supreme Court decided central office telephone, and it said all the services that involve all the subject, as this court said in Brown, have to be put in the tariff. So whether you can now come back and say, well, through a fraud theory we can try to enforce some injunctive setup beyond the tariff is not clear because it's all within the realm of services. But even assuming that's possible, what is the theory in this case, that California's fraud law exactly fits the contours of this agreement, and therefore under California's fraud law what the jury will be allowed to do is implement the agreement? If they wanted to make that argument, the argument is you violated the agreement. When they chose not to argue that it was a violation of the agreement, when they put off that issue and consciously chose not to do it, they chose not to make the argument, well, we would straight enforce the terms of the deal. I mean, to say a tort theory will allow you to get your contract, what you agree to in contract is kind of a bizarre idea. The normal rule is you can't make torts out of contracts. If there aren't any further questions, I see I'm out of time. Thank you, Your Honor. I think I've just got four, maybe five quick points. First, Judge Paez, 252i of the Telecom Act says that once an agreement is approved in a State, it's available to any other competitor or customer that wants it under the – in that State. And so it turns out that actually a lot of CLEP customers of Verizon have the same provision that COVID does. So when COVID doesn't follow the procedure of waiting for a real trouble and doing testing, it's getting a preference compared to all the other CLEPs under that same – that same agreement. Second, the district court understood how the rebates work. And at the excerpts of record, page 528 said, If Verizon's performance fell below certain levels, COVID was entitled to substantial payments or price reductions. The idea that we're going to deprive COVID of two months of revenue pales in comparison to COVID receiving millions of dollars in concessions as a result of the scheme. That's the district court's understanding of our complaint and one of the reasons that COVID did this. How do you answer the – what he said, that you deliberately chose to go into it and gave up the contract? We believe that this is properly looked at as a tort, but we would be entitled, even under our tort complaint, with no amendment at all. But face the question. He said, and I think it seems quite plausible, you deliberately made a strategic choice. Now you're stuck with it. Why not? Well, suppose we did. Suppose we did. I think under the tort claim alone, we're entitled to an injunction that they stop committing the tort and that instead they do the testing for real troubles rather than submitting false ones. I think even if you held that no amendment was proper, we would be entitled to an injunction under our existing complaint. But since there was no prejudice to COVID, there was no discovery done in this case, the district court essentially decided this on the pleadings. I think we should be entitled to an amendment. The – Kennedy, I wouldn't say it's in his discretion. Judge Fogle's discretion. The liberal amendment policy, I believe, should continue where the district court initially said there's no contract claim, now says that's our exclusive claim and there is a claim. We should be allowed to pursue something that looks like is a valid claim that hasn't been collected on it, where there's still substantial harm being done to other customers. I want to just make sure you have cited to you the – there's a Supreme Court case. This is a little bit arcane. I apologize again. But Verizon Maryland against the Public Service Commission of Maryland, 122 Supreme Court, 1753, that says the fact that the State commissions approve the agreements does not strip the Federal district courts of jurisdiction to hear cases like this. And just one other case to point out. In the Seventh Circuit, the Harper Plastics decision is exactly like this. It was a case where there was an antitrust claim and State law claims filed. The antitrust claim was dismissed. The State law claims survived. But in the meantime, the plaintiff had pled State law claims elsewhere that the Seventh Circuit held were barred by res judicata. That's what's happened here. COVID pled an antitrust claim and other State law claims in D.C. That case, the antitrust claim has been dismissed on the merits. The State law claims that were pled in D.C. are still available to COVAD to be refiled somewhere, but new State claims pled elsewhere are barred by the final judgment  in D.C. And that's the reason that if you reverse on the filed tariff ground, their claims do not come back to life because they're barred by res judicata. If there are no other questions, thank you very much. Thank you, counsel. The case just argued will be submitted. The next case on the calendar is Jeremio v. Board Motor Company.  We're rolling it. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Reinhardt, Noonan, Paez